WILSON, J. (dissenting).
The majority has confused "continuous treatment" with a chronic condition, effectively reading "continuous" out of the statute of limitations without regard for the plain meaning of the word or the legislature's intent. Accordingly, I dissent.
In Borgia v. City of New York, 12 N.Y.2d 151, 237 N.Y.S.2d 319, 187 N.E.2d 777 (1962), we announced the original "continuous treatment" doctrine in medical malpractice cases. The plaintiff in Borgia, a child admittedly brain damaged by the negligence of a New York City hospital, was hospitalized continuously for more than 16 months, from October 10, 1956 until February 14, 1958. The negligent acts occurred on four separate dates spanning more than a year within his hospitalization, the first and most serious occurring on the day after his admission. Because the hospital was municipally owned, the malpractice claim was **758 subject to the 90-day notice requirement of N.Y. General Municipal Law § 50-e. His father filed the notice of claim 63 days after the child was discharged, but more than 90 days from the last date of malpractice alleged. We held that a malpractice claim did not accrue until the end of continuous treatment to avoid the expiration of the 90 days "while [the plaintiff] was still a patient receiving care and treatment related to the conditions produced by the earlier wrongful acts and omissions of defendant's employees" ( 12 N.Y.2d at 156, 237 N.Y.S.2d 319, 187 N.E.2d 777 ). We noted that "[i]t would be absurd to require a wronged patient to interrupt corrective efforts by serving a summons on the physician or hospital superintendent or by filing a notice of claim in the case of a city hospital" ( id. ).
As pertains to this case, CPLR 214-a requires that an action for medical malpractice must be commenced "within two years and six months of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure." In 1975, the legislature, motivated by "the critical threat to the health and welfare of the State by way of diminished *896 delivery of health care services as a result of the lack of adequate medical malpractice insurance coverage at reasonable rates," enacted CPLR 214-a as part of "comprehensive[ ]" legislation "in relation to medical malpractice" (Governor's Program Bill Mem at 1, Bill Jacket, L 1975, ch 109). The legislature shortened the statute of limitations for medical malpractice and grudgingly codified Borgia's "continuous treatment" rule, "clearly limit [ing] it to prevent abuse" (id. at 3). In particular, the legislature noted, "[w]hatever the essential merit of this theory ... it certainly should not be subject to further extension by way of unilateral manipulation by a plaintiff" (id. ).
As we have explained, the purpose of the doctrine is "to ameliorate the harshness of a rule which ties accrual of a malpractice action to the date of the offending act, thereby creating a dilemma for the patient, who must choose between silently accepting continued corrective treatment from the offending physician, with the risk that his claim will be time-barred or promptly instituting an action, with the risk that the physician-patient relationship will be destroyed" ( Rizk v. Cohen, 73 N.Y.2d 98, 104, 538 N.Y.S.2d 229, 535 N.E.2d 282 [1989] [citation omitted] ).
**759 The doctrine reflects sound policy: "a patient should not be required to interrupt corrective medical treatment by a physician and undermine the continuing trust in the physician-patient relationship in order to ensure the timeliness of a medical malpractice action or notice of claim" ( Young v. New York City Health & Hosps. Corp., 91 N.Y.2d 291, 296, 670 N.Y.S.2d 169, 693 N.E.2d 196 [1998] [citations omitted] ).
Conversely, we have held that "[a] patient is not entitled to the benefit of the toll in the absence of continuing efforts by a doctor to treat a particular condition because the policy reasons underlying the continuous treatment doctrine do not justify the patient's delay in bringing suit in such circumstances" ( Massie v. Crawford, 78 N.Y.2d 516, 519, 577 N.Y.S.2d 223, 583 N.E.2d 935 [1991] ). In Massie, a physician placed an IUD at the plaintiff's request, advising her that although it "could remain in place indefinitely ... [she] should return to [him] periodically for routine gynecologic examinations" ( id. at 518, 577 N.Y.S.2d 223, 583 N.E.2d 935 ). Plaintiff returned exactly as instructed; 15 years later, plaintiff, suffering from abdominal pain and fever, saw the doctor, who determined she had developed pelvic inflammatory disease requiring a hysterectomy. Despite the plaintiff's allegations that her injury was caused by the doctor's medical malpractice, we affirmed the dismissal of her complaint, holding that her claim did not fall within the toll of the continuous treatment doctrine as a matter of law. We expressly stated that even though her doctor, after inserting the IUD, had instructed her to return for periodic examinations, "these visits may not serve as a basis for applying the continuous treatment exception because plaintiff could have interrupted the services and switched physicians at any time without jeopardizing her health" ( id. at 520, 577 N.Y.S.2d 223, 583 N.E.2d 935 [emphasis added] ).
The undisputed facts in Ms. Lohnas' case are not meaningfully distinguishable from those in Massie. Neither plaintiff was undergoing treatment that could properly be described as "continuous," and neither case in any way implicates the policy concerns underlying the continuous treatment doctrine. According to Ms. Lohnas' complaint, Dr. Luzi's grossly improper installation of the humeral head in January 1999 eventually caused the destruction of her rotator cuff and glenoid. After the surgery, Ms. Lohnas saw Dr. Luzi for several post-operative appointments *897 through January 2000. In August 2001, Ms. Lohnas returned to Dr. Luzi, complaining of severe shoulder pain. Dr. Luzi performed a different treatment, rotator cuff surgery, **760 in January 2002, and Ms. Lohnas had several post-operative appointments throughout that year. In September 2003, Ms. Lohnas saw Dr. Luzi to "check on" her condition after she was pushed into a wall and experiencing significant pain. Dr. Luzi diagnosed a strain and contusion, recommended exercises on her own, and indicated he would see her on an "as needed basis." Even though she alleges her pain was "terrible" in the following years, she chose not to see Dr. Luzi until April 2006.
Viewed in the light most favorable to Ms. Lohnas, the facts make clear that Dr. Luzi was not performing continuous treatment. Like Ms. Massie's doctor, who instructed her to return periodically, Dr. Luzi told Ms. Lohnas to return "as needed." During the gap of more than 30 months between her 2003 and 2006 appointments, Ms. Lohnas did not seek out corrective treatment from Dr. Luzi by way of a "timely" return visit (see Curcio v. Ippolito, 63 N.Y.2d 967, 969, 483 N.Y.S.2d 989, 473 N.E.2d 239 [1984] ), and even her 2003 visit stemmed from an incident where her affected shoulder was injured by a new forcible trauma. Her case does not implicate the policy concerns underlying the doctrine. Ms. Lohnas' chronic shoulder condition did not impinge on her ability to consult another doctor, which she eventually did. There were neither "corrective efforts" nor any "course of treatment" being administered by Dr. Luzi between 2003 and 2006. Thus, it would not be "absurd" to have required her to commence her suit between 2003 and 2006 (see Borgia at 156, 237 N.Y.S.2d 319, 187 N.E.2d 777 ). Ms. Lohnas would have "jeopardize[d] nothing by instituting suit ... if she believed defendant guilty of malpractice" (see Massie at 520, 577 N.Y.S.2d 223, 583 N.E.2d 935 ).
Public policy animated our creation of the continuous treatment doctrine: a doctor engaged in continuous treatment of a patient should not have her efforts chilled by the filing of a lawsuit, nor should the patient undergoing such treatment be required to suffer the burden of suing the physician while still in her care. Where, as here, the treatment is not continuous, no such policy concerns warrant an exception to the limitations period. Indeed, when continuous treatment is absent, public policy, as embodied in the legislature's selection of a limitations period, cuts the other way: a plaintiff whose surgery and follow-up appointments have been completed, who has been discharged from the hospital, returns to normal life activities, and still suffers "terrible" pain, is on notice that something may be wrong, and is required to take steps to determine whether she has a claim-including by consulting a different doctor if necessary-and file it within the prescribed period.
**761 The majority's interpretation of continuous treatment undermines our prior decisions and the purpose of the doctrine. Continuous treatment cannot mean simply a continuing diagnosis (see McDermott v. Torre, 56 N.Y.2d 399, 406, 452 N.Y.S.2d 351, 437 N.E.2d 1108 [1982] ["(T)he continuing nature of a diagnosis does not itself amount to continuous treatment"] ) nor a continuing physician-patient relationship (see Borgia at 157, 237 N.Y.S.2d 319, 187 N.E.2d 777 ; see also McDermott at 405, 452 N.Y.S.2d 351, 437 N.E.2d 1108 ["The concern, of course, is whether there has been continuous treatment, and not merely a continuing relation between physician and patient"] ), yet the majority opinion means just that. The majority relies on the facts that Ms. Lohnas had a "chronic, long-term condition," Dr. Luzi and Ms. Lohnas understood that Ms. Lohnas would likely need additional treatment at some *898 undefined point in the future, and Ms. Lohnas considered Dr. Luzi her only doctor during this time. But those facts are irrelevant to whether, during the 32-month gap, Ms. Lohnas' filing a lawsuit would have interfered with her treatment. It would not have, because there was none. Ignoring the policy behind the doctrine and the common meaning of "continuous," the majority's opinion risks expanding the statute of limitations indefinitely, so long as a plaintiff can establish that she suffers from the same condition or injury and believed she had no other option than to continue to see the same physician. The decision also vitiates the doctrine's timeliness requirement, which bars the toll as a matter of law where, as here, a gap in treatment exceeds any reasonable interpretation of timely (see Curcio, 63 N.Y.2d at 969, 483 N.Y.S.2d 989, 473 N.E.2d 239 [granting summary judgment on the ground that three years passed between doctor visits] ). I suppose the majority's decision leaves open the possibility that, following the conclusion of treatment, physicians could inform patients in writing never to return, thus commencing the statute of limitations, but the public policy ramifications of that option seem ghastly.
Ms. Lohnas "could have interrupted the services and switched physicians at any time without jeopardizing her health" ( Massie at 520, 577 N.Y.S.2d 223, 583 N.E.2d 935 ). Instead, she likely aggravated the effects of Dr. Luzi's alleged malpractice by seeking no medical care for her shoulder from 2003 to 2006, choosing not to switch physicians or even consult another doctor.* The result here is particularly incongruous when contrasted to plaintiffs who are **762 injured by malpractice that cannot be discovered until the statute of limitations has run, and whose claims are therefore barred (see Goldsmith v. Howmedica, Inc., 67 N.Y.2d 120, 500 N.Y.S.2d 640, 491 N.E.2d 1097 [1986] [statute of limitations barred claim where hip replacement did not break until eight years later]; Helgans v. Plurad, 255 A.D.2d 554, 680 N.Y.S.2d 648 [2d Dept. 1998] [claim barred where malignant melanoma was misdiagnosed as a harmless beauty mark eight years earlier] ). Even though Ms. Lohnas had every reason to believe that something was wrong, including her admission that, after 2003, she had lost faith in Dr. Luzi because nothing he had done had worked, her claim survives. I have no doubt the result here falls within what the legislature intended to prohibit as a "further extension by way of unilateral manipulation by a plaintiff." Accordingly, I dissent.
Order, insofar as appealed from, affirmed, with costs, and certified question answered in the affirmative.
Judges Rivera, Fahey and Feinman concur; Judge Wilson dissents in an opinion, in which Chief Judge DiFiore and Judge Stein concur.

Ms. Lohnas' own expert-Dr. Paterson, the surgeon who detected Dr. Luzi's alleged improper positioning of the implant-testified that, in his professional opinion, the humeral implant placed by Dr. Luzi was retroverted-mispositioned by 80 to 110 degrees. That "excessive retroversion ... and the larger size of the humeral head ... combined to create unnatural forces on the rotator cuff." Over time, the retroversion wore down the glenoid and led to "premature chronic rupture of the rotator cuff and failure of the implant and the prosthesis." During the years following Dr. Luzi's malpractice, Ms. Lohnas experienced pain, a torn rotator cuff, and shoulder dislocation because "over time, as a result of having no rotator cuff to keep [the shoulder] where it belonged, it slowly started to head out of the joint."